IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:04-CR-688 DB |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES FRED GORDON | ) | **REPORT & RECOMMENDATION** |
| and DANELLE DECEW, | ) | |
| | ) | District Judge Dee Benson |
| Defendants. | ) | Magistrate Judge David Nuffer |
| | ) | |

Defendant Danelle Decew filed a Motion to Suppress all evidence seized from her residence pursuant to a search warrant, and any post-arrest statements. (Dkt. no. 25.) Defendant James Fred Gordon filed a Joinder in Motion to Suppress the evidence seized from the residence. (Dkt. no. 77.) In addition, Defendant Decew filed a separate Motion to Suppress Statements of Defendant made in an interview that occurred after counsel had been appointed and she was being held at a detention facility. (Dkt. no. 43.) The case was referred to the Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).

On March 1, 2005, the Magistrate Judge held a hearing on the motions to suppress. Mary Corporon represented Defendant Decew, Gil Athay represented Defendant Gordon, and Vernon Stejskal represented the government. Following the hearing, the parties submitted additional briefing which was complete on April 8, 2005.

**I. Facts**

Detective Tyler Boelter of the Salt Lake City Police Department testified at the hearing. At the time relevant to the investigation, Detective Boelter was assigned to the DEA Metro Narcotics Task Force.  (Tr. 28.)

On May 14, 2004, Detective Boelter and other officers executed a search warrant at 1275 Gunn Avenue in Salt Lake City, Utah.  (Tr. 29.)  Detective Boelter testified that approximately seventeen officers participated in executing the search warrant at the residence.  (Tr. 34.)  Ten or eleven officers actually entered the house, while the others took part in pre-surveillance of the house or were part of a team that searched the detached garage.  (Tr. 36.)  The officers entered the house about 4:15 in the morning.  (Tr. 30, 34.)  All of the officers entered through the same side door on the east side of the house.  (Tr. 36-37.)  This door was the one closest to the stairway leading to the basement bedroom where Defendant Decew was located.  The officers gained entry by knocking in the door with a battering ram, creating a loud noise.  (Tr. 37.)  After the door was knocked down, ten to eleven officers immediately entered the house over the top of the door with their weapons drawn.  (Tr. 37-38, 43.)  Detective Boelter explained that the weapons were drawn for officer safety reasons.  (Tr. 38, 43.)

All of the officers were dressed in black clothing from head to toe, and were wearing bullet-proof vests that said "police" on the front and back.  The officers were also wearing heavy boots, black helmets, and hoods.  The hoods covered the officers' entire heads and faces except for the eyes and nose.  (38-40.)

2

Upon entry, the officers quickly moved throughout the house so that some officers were in every room of the house almost immediately.  (Tr. 40.)  Defendant Decew was found in a basement bedroom sitting on a makeshift bed on the floor.  (Tr. 41.)  She immediately was placed in handcuffs with her hands behind her back, and patted down for weapons.  She was then taken upstairs to the living room and seated on the couch with the other two defendants, Defendant Gordon and John Vincent Allen, who were also present in the residence.  (Tr. 30, 42-44.)  She remained on the couch from about 4:15 a.m. until she was interviewed about an hour later.  (Tr. 30, 44.)  During that time, Defendant Decew was held under guard by an armed police officer, who was dressed in black from head to toe.  However, his gun was in its holster.  (Tr. 45-46.)

Defendant Allen was the first to be interviewed at about 4:30 a.m.  (Tr. 30.)  About 5:10 a.m., Defendant Decew was interviewed by Detectives Boelter and Davis.  (Tr. 30-31.)  During the interview, which took place just outside the residence in the driveway, Defendant Decew was seated in a chair and restrained in handcuffs.  (Tr. 31, 46, 54.)  In conducting the interview, Detective Boelter identified himself and explained that the officers were serving a narcotics search warrant.  He then advised Defendant Decew of her Miranda rights, and asked if she wanted to speak to him.  (Tr. 31, 47.)  She responded that she did by saying "sure."  (Tr. 31-32, 48.)

Detective Boelter testified that Defendant Decew appeared to understand the conversation, answered his questions appropriately, expressed no reservations as far as

understanding her Miranda rights, and clearly indicated that she wished to speak with him.  (Tr. 31-32.)  She did not indicate at any time that she wished to terminate the interview.  (Tr. 33.)  During the course of the interview, Defendant Decew made some incriminating statements.  (Tr. 32-33.)  Detective Boelter testified that he did not display any weapon or use any force to cause Defendant Decew to make the statements.  (Tr. 33.)  However, he admitted that he told  her that he was primarily interested in obtaining information about the two men in the house, Defendants Allen and Gordon, and that it might benefit her if she cooperated in giving information.  (Tr. 48-49.)  He did not make any specific promises or threats to Defendant Decew.  (Tr. 56.)  The interview lasted about fifteen or twenty minutes.  (Tr. 54.)

## II. DISCUSSION

### A. Voluntariness of Defendant Decew's Statements Following Execution of the Warrant

Defendant Decew contends that her statements at the time of the execution of the warrant were not voluntary and should be suppressed.[1]  "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne run afoul of the Fifth Amendment and are inadmissible at trial as evidence of guilt."  United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997); see Malloy v. Hogan, 378 U.S. 1, 7 (1964).

---

[1] Even though Defendant Decew concedes that her Miranda rights were not violated (Tr. 58), her statements would still be inadmissible if they were made involuntarily.  United States v. Erekson, 70 F.3d 1153, 1157 (10th Cir. 1995); see United States v. Roman-Zarate, 115 F.3d 778, 783 (10th Cir. 1997); United States v. Chalan, 812 F.2d 1302, 1307 (10th Cir. 1987).

Coercive police activity is a necessary predicate to a finding that a statement was not voluntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986).

The determination of voluntariness is made on the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation.  United States v. Roman-Zarate, 115 F.3d 778, 783 (10th Cir. 1997); United States v. Erekson, 70 F.3d 1153, 1157 (10th Cir. 1995).  Factors to be considered are "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment."  Glover, 104 F.3d at 1579 (10th Cir. 1997).  See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).  The government has the burden to prove that the statements were voluntary.  Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Muniz, 1 F.3d 1018, 1021 (10th Cir. 1993).

Considering the above factors, no evidence was presented that Defendant Decew was especially susceptible to having her will overborne based on her age, lack of education, or intelligence.  The length of detention prior to questioning was relatively brief, lasting only about an hour.  Defendant does not dispute that she was advised of, and waived, her Miranda rights.  The questioning itself lasted only about fifteen or twenty minutes.  See Glover, 104 F.3d at 1580 (stating that conversation lasting no more than twenty minutes was not excessively long); Erekson, 70 F.3d at 1157 (same).  Finally, it is undisputed that Defendant was not subjected to physical punishment.

In support of her contention that her statements were involuntary, Defendant Decew points to the forced entry of her home in the early morning hours, and statements by Officer Boelter that she would benefit by cooperating, and that he was mainly interested in the other two defendants and their methamphetamine laboratory.  The entry of the officers by knocking down the door, dressed as described with their guns drawn, would no doubt be frightening and would have an intimidating effect.  However, an hour had passed between the time of the entry and the interrogation of Defendant Decew.  Thus, the shock of the initial entry had time to subside before the interview took place.  Several courts have held that even in the case of physical abuse, a confession taken after a lapse of time is not involuntary.  See, e.g., United States v. Slater, 971 F.2d 626, 629, 636-37 (10th Cir. 1992)(even though officers hit and kicked defendant upon apprehension, his statements given in subsequent interrogation at police headquarters were voluntary).

In United States v. Zuber, 899 F. Supp. 188 (D. Vt. 1995), three officers wearing flak jackets entered a home with their weapons drawn to make an arrest.  After they had secured the defendant and another man face down on the floor upstairs with their hands cuffed behind their backs, a fourth officer arrived, and went upstairs with his gun drawn.  However, he holstered it when he saw that the area was secure.  The defendant waived his Miranda rights, and thereafter made incriminating statements.  Id. at 190-91.  He later contended that his statements were involuntarily made in violation of his due process rights.  Id. at 192.  The district court observed that "[i]n order for a statement to be involuntary for due process purposes, it must be the product

of government coercion." Id., (citing Connelly, 479 U.S. at 167).  Applying a totality of the

circumstances analysis, the court found that the statements were voluntarily made.  The court

noted that although the circumstances might not have required the officers to be as aggressive as

they were, their conduct was directed entirely toward securing the premises and making an arrest.

The officers did not threaten the defendant in any way or attempt to pressure him to confess.

Rather, he was given his Miranda rights, and he agreed to cooperate.  The court concluded that in

the absence of government coercion, his statements under the circumstances were fully

voluntary.  Id. at 193.

In United States v. Jones, 696 F.2d 479 (7th Cir. 1982), officers entering a motel room to

make an arrest engaged in a struggle with the defendants, during which a shotgun was

discharged.  Id. at 483.  After receiving Miranda warnings, the defendants made incriminating

statements.  The defendants subsequently argued that their statements were inadmissible because

they were in a state of shock following the shotgun blast, and could not appreciate the Miranda

warnings.  Id. at 488.  The court rejected this argument stating that "although a point-blank

shotgun blast is very violent, we do not believe that the explosion necessarily meant that the

defendants could not appreciate the import of the warning given to them." Id.  The court held

that the warnings were adequate to protect the defendants' rights.  Id.

In the instant case, the manner of the entry into the house with guns drawn was directed

toward securing the premises and protecting the officers' safety.  The officers did not threaten

Defendant Decew in an way or attempt to coerce her into confessing.  Like the defendants in

Zuber and Jones, she was given her Miranda rights, and chose to cooperate with the investigation.

Regarding Detective Boelter's statement that it would be to Defendant Decew's benefit to cooperate, the court concludes that this is not the kind of statement that would render Defendant's statements involuntary.  In support of her argument, Defendant cites Bram v. United States, 168 U.S. 532, 542-43 (1897), in which the Supreme Court stated that a confession is involuntary if it is "obtained by any direct or implied promises, however slight."  Although the Court has quoted this passage in many subsequent cases, see, e.g., Malloy v. Hogan, 378 U.S. at 7, the Court stated in Arizona v. Fulminante, 499 U.S. 279 (1991), that "it is clear that this passage from Bram, . . . under current precedent does not state the standard for determining the voluntariness of a confession."  Id. at 285.  Rather, the determination of voluntariness must be viewed under the totality of the circumstances.  Id. at 285-86; United States v. Matthews, 942 F.2d 779, 782 (10th Cir. 1991); see United States v. McCurdy, 40 F.3d 1111, 1118 (10th Cir. 1994).

In Roman-Zarate, 115 F.3d 778, the defendant invoked his right to counsel after being advised of his Miranda rights.  Subsequently, one of the arresting DEA agents arrived at the conference room where the defendant was being held and asked the other agents if the defendant was cooperating.  After a moment, the defendant asked what the agent had meant by cooperating. The agent explained that he wondered if the defendant was "'going to help [himself] out' by assisting in the investigation."  Id.  at 780.  Further, the defendant was told that "the agents could

not guarantee leniency, but that cooperation could help him." Id.  On appeal, the defendant

contended that his subsequent incriminating statements were made involuntarily.  In rejecting

this claim, the Tenth Circuit concluded that the defendant's decision to cooperate in exchange for

possible leniency was not the product of coercion. Id. at 783.  In reaching this conclusion, the

court observed that the only agreement reached was to make the defendant's cooperation known

to the United States Attorney.  Id. at 783.  The court stated that although the agent appeared to

have manipulated the encounter with the defendant, his actions were not so extraordinary as to

have deprived the defendant of his ability to make a rational choice.  Id. at 784.  On several

occasions, the Tenth Circuit has held that a similar promise that officers would inform the

prosecutor of the defendant's cooperation does not render the subsequent confession involuntary.

See, e.g., United States v. Nguyen, 155 F.3d 1219, 1223 (10th Cir. 1998)(officer's statement that

prosecutor would be informed of defendant's cooperation, without other indications of coercion,

does not constitute a promise of leniency); United States v. Lewis, 24 F.3d 79, 82 (10th Cir.

1994).

        Many other cases hold that police statements that a defendant's cooperation might help

him do not render his subsequent confession involuntary.  See, e.g., United States v. Toles, 297

F.3d 959, 966 (10th Cir. 2002)(possibility that officer may have discussed the benefits of

cooperation did not render the defendant's statement involuntary); Matthews, 942 F.2d at 782

(statements made on day of arrest were voluntary where officers told defendant if he cooperated

no state charges and probably no federal charges would be filed, but defendant only called

9

officers twice in three months and provided no further information); <u>Rose v. Lee</u>, 252 F.3d 676, 685-86 (4th Cir. 2001)(agent's statement that "things would go easier" on the defendant if he confessed, did not amount to unconstitutional coercion where there was no threat of actual physical violence, and no indication that the statement overcame his will or critically impaired his capacity for self-determination); <u>United States v. Otters</u>, 197 F.3d 316 (8th Cir. 1999) (statement voluntary where after reading <u>Miranda</u> rights, agents told the defendant that if he cooperated, no state charges would be filed, even though defendant testified that he understood that <u>no state or federal charges</u> would be filed, and he would "probably walk free"); <u>United States v. Ramirez</u>, 112 F.3d 849, 853 (7th Cir. 1997)(statements voluntary where agents made no threats or promises, but merely pointed out that cooperation could result in a reduced sentence or other concessions, and there was no promise calculated to prevent defendant from rationally deciding whether to speak); <u>United States v. Rutledge</u>, 900 F.2d 1127 (7th Cir. 1990)(officer's statement that "all cooperation is helpful" did not render defendant's statements involuntary); <u>United States v. Alvarado</u>, 882 F.2d 645, 649-50 (2d Cir. 1989)(statement voluntary although officers told defendant "it would be in her best interest to cooperate" where the circumstances did not otherwise suggest coercion), <u>overruled on other grounds by</u> <u>Bailey v. United States</u>, 516 U.S. 137 (1995).

   In the instant case, Detective Boelter admitted that he told Defendant Decew that it might be to her benefit, or that she could help herself out, if she was cooperative.  (Tr. 49.)  However, he did not make any specific promises or threats to Defendant.  (Tr. 56.)  Detective Boelter's

limited suggestion that Defendant's cooperation would benefit her does not amount to the type of unconstitutional coercion that would render Defendant's statements involuntary.  See Connelly, 479 U.S. at 167.

Defendant also cites 18 U.S.C. § 3501 which lists factors that the court may consider in determining whether a statement is voluntary.  Among these factors is the defendant's awareness of the charges that she is facing.  § 3501(b)(2).  Defendant states that she was never told of any charges to be filed against her.  While the court may consider whether the defendant knew the nature of the offense in making its voluntariness determination, a confession is not coerced merely because the defendant was not informed of all the potential charges that could be brought against her.  Toles, 297 F.3d at 966; Nguyen, 155 F.3d at 1222.  In the instant case, Defendant was aware of the nature of the offense under investigation because Detective Boelter informed Defendant that he was executing a narcotics search warrant.  See United States v. Unser, 165 F.3d 755, 766-67 (10th Cir. 1999)(statement voluntary even though agents used "a measure of subterfuge" to get defendant to meet with them without telling him he was the target of a criminal investigation, where evidence supported a reasonable inference that defendant knew that he might be under investigation).

Defendant also suggests that she was misled by Officer's Boelter's assurance that his main interest was the other two defendants.  A statement may be involuntary and therefore inadmissible if it was obtained by deceit and misrepresentation by police officers.  Erekson, 70 F.3d at 1158.  However, in order to prevail on this claim, Defendant must provide clear and

11

convincing evidence that the officers affirmatively misled her as to the true nature of the investigation, and that the misinformation was material to her decision to speak.  Simple failure to inform the defendant that she is the subject of the investigation does not amount to affirmative deceit.  Id.  United States v. Serlin, 707 F.2d 953, 956 (7th Cir. 1983).  Detective Boelter's representation that he was primarily interested in the other two defendants and their methamphetamine laboratory was a true statement which therefore cannot be equated with affirmative deceit.  See Erekson, 70 F.3d at 1158 (officer's response to defendant's inquiry that he was not the focus of the investigation was true although he later became a focus of investigation); Serlin, 707 F.2d at 957; cf. United States v. Byram, 145 F.3d 405, 407-08 (1st Cir. 1998)("a false assurance to a suspect that he was not in danger of prosecution" held not to constitute coercion).

    In the instant case, Defendant Decew was aware of the nature of the investigation. Further, she was informed that her statements could be used against her in court.  Moreover, Detective Boelter testified that he did not tell Defendant that no charges would be filed against her.  Accordingly, the court finds that under the totality of the circumstances, Defendant Decew's statements were voluntary.

**B. Probable Cause for the Search Warrant**

    The search warrant was issued by a state court judge in Third District Court, State of Utah.  Defendants Decew and Gordon contend that the search warrant was not supported by probable cause.  In particular, they object to certain portions of the affidavit in support of the

search warrant regarding activities related to the manufacture of methamphetamine by individuals who did not reside at the residence.

The evidence contained in the affidavit supporting the warrant is as follows:

1.  Detective Boelter received information from a concerned citizen (CC) that individuals residing at, or otherwise occupying, the residence were in possession of a clandestine methamphetamine laboratory.  The CC stated that a close associate had observed scientific glassware at the residence.  When the associate inquired about the glassware, he/she was informed that it was a chemistry set.  Detective Boelter knew from training and experience that scientific glassware, as described by the CC, is commonly used in the manufacture of methamphetamine.  (Aff. for Search Warrant at 2, Ex. 1[2])

2.  A confidential informant (CI) told Detective Boelter that individuals residing at, or otherwise occupying the residence, were "engaging in an ongoing clandestine methamphetamine manufacturing operation."  (Id. at 3.)  The CI stated that he/she had conversed with the residents or occupants of the residence concerning the methamphetamine manufacturing process, and the distribution of methamphetamine.  The CI further stated that numerous individuals often occupied the residence to consume methamphetamine.  Detective Boelter considered the information provided by the CI to be accurate and reliable because the CI had assisted Detective Boelter and other officers on previous occasions in investigating narcotics-related offenses.

_____

[2]All exhibits are attached to the Government's Response to Defendant Decew's Motion to Suppress, Docket. no. 76.

Information previously provided by the CI had resulted in the issuance of multiple search warrants where at least three meth labs and large quantities of narcotics and paraphernalia were found.  (Id.)

3.  Detective Boelter attempted to verify the information provided by the CC and the CI through independent investigation during which he conducted three trash covers on the residence. In the first trash cover, Detective Boelter discovered Ziploc baggies and drug paraphernalia commonly used in the distribution and consumption of methamphetamine, as well as residency documents for Defendant Allen.  In the second trash cover, he found a broken glass meth pipe, packaging material, syringes, and residency documents for Defendant Allen and individuals named Jeremy Soderquist and Aerean Morris.  The third trash cover revealed numerous syringes, packaging materials, and residency documents.  (Id.)

4.  Officers conducted testing on the material obtained from the trash covers using an Ion scan Model 400B.  The Ion scan 400B analyzes microscopic particles of controlled substances. On November 4, 2003, a test performed on miscellaneous paraphernalia from the first trash cover was positive for methamphetamine and cocaine on all samples tested.  (Id.)  A test performed May 5, 2004 on miscellaneous syringes, residency documents, and packaging materials seized from the second trash cover was positive for methamphetamine on all samples.  On May 10, 2004, Detective Boelter tested a syringe containing liquid seized in the third trash cover.  The test indicated the presence of methamphetamine.  (Id. at 4.)

5.  In the first trash cover, Detective Boelter found papers listing Defendant Allen's telephone number.  In addition, he found a telephone number with the name "Jeremy" written next to it.  Detective Boelter recognized this number as belonging to Jeremy Ludlow.  Detective Boelter knew that Mr. Ludlow had been associated with the seizure of two meth labs within the five months preceding the application for the search warrant.  Detective Boelter also knew that Mr. Ludlow and his associates had purchased large quantities of precursor chemicals for the production of methamphetamine.  In March 2004, Mr. Ludlow was arrested for his association with a meth lab seized in Salt Lake City, Utah.  At that time, Mr. Ludlow told Detective Boelter that he was aware of another meth lab in the area of 3300 S. Highland Drive, Salt Lake City, Utah.  (Id.)  Mr. Ludlow refused to give any further information unless Detective Boelter would arrange that he not be arrested.  (Id. at 4-5).  Detective Boelter noted that the address of 3300 S. Highland Drive is approximately two blocks from the residence that was the subject of the search warrant at issue in this case.  (Id. at 5.)

6.  Detective Boelter subpoenaed the subscriber information and detailed toll information for Defendant Allen's telephone number for the period September 25, 2003 to October 25, 2003.  This information revealed thirty-three calls placed from telephone no. 968-3847 to Defendant Allen's phone.  Through investigation, Detective Boelter discovered that Jeremy Ludlow had provided this number when purchasing precursor chemicals.  Detective Boelter stated that individuals who are involved in manufacturing methamphetamine often enlist the assistance of

others who are addicted to the drug to assist in obtaining the precursor chemicals necessary for the manufacturing process.  (Id.)

7.  Detective Boelter conducted surveillance of the residence, with the last surveillance period being in the last seventy-two hours preceding the application for the search warrant. While conducting surveillance, he observed individuals coming and going between the residence and a motor home parked to the east of the residence.  Detective Boelter knew from training and experience that individuals involved in the manufacture of methamphetamine often store chemicals and components in trailers and outbuildings, and that they often produce the substance in such locations.  (Id.)

8.  Through record checks, Detective Boelter discovered that the name Aerean Morris is an alias for Aerean Bromage who had three prior arrests for offenses related to the possession and distribution of methamphetamine.  Defendant Boelter also discovered that Defendant Allen had been arrested on two prior occasions for drug-related offenses.  In addition, Jeremy Soderquist had been arrested for possession of drug paraphernalia.  (Id. at 5.)

Defendants specifically object to the portions of the affidavit relating to individuals who did not live at the residence, and whose only connection to the residence was based upon a name or telephone number found in the trash.  Defendants contend that this information is too unrelated to the residence to support a finding of probable cause for a search warrant for a meth lab.  (Tr. 15-18, 24-25.)  They state that the affidavit, at most, might support a warrant for a search for illegal drugs themselves, but not for a lab.  (Tr. 18.)

The Tenth Circuit has specifically rejected an analytical method by which each piece of information in an affidavit is reviewed to see whether it, standing alone, can support a finding of probable cause.  Glover, 104 F.3d at 1578; United States v. Cardall, 773 F.2d 1128, 1132 (10th Cir. 1985); see Massachusetts v. Upton, 466 U.S. 727, 733 (1984)(per curiam).  "Instead, the determination must be based upon the 'totality' of the information in the affidavit."  Glover, 104 F.3d at 1578; Cardall, 773 F.2d at 1132 (stating that the affidavit must be taken as a whole).  In determining whether a warrant is supported by probable cause, the court does not view each fact in isolation.  "While one fact alone may not support a finding of probable cause, a cumulative assessment may indeed lead to that conclusion."  United States v. Cantu, No. 04-3291, 2005 WL 1060596, at *3 (10th Cir. May 6, 2005).

The Supreme Court has stated that the task of the judicial officer in issuing a search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and the "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

Illinois v. Gates, 462 U.S. 213, 238 (1983).

 "A reviewing court must give 'great deference' to the magistrate's determination of probable cause and should uphold that conclusion if the 'totality of the information contained in the affidavit provided a substantial basis for finding there was a fair probability that evidence of criminal activity would be found.'"  United States v. Soussi, 29 F.3d 565, 568-69 (10th Cir.

1994); United States v. Hager, 969 F.2d 883, 887 (10th Cir. 1992), abrogated on other grounds by

Bailey v. United States, 516 U.S. 137 (1995); Cantu, 2005 WL 1060596, at *2 (court's review is

limited to ensuring that the issuing officer's determination had a substantial basis).  See also

Upton, 466 U.S. at 732-33 (stating that a reviewing court should not conduct "a de novo probable

cause determination," but instead should merely decide "whether the evidence viewed as a whole

provided a 'substantial basis' for the Magistrate's finding of probable cause").

      In determining the value of an informant's tip, his "veracity" or "reliability" and his

"basis of knowledge" are "relevant considerations in the totality-of-the-circumstances analysis."

Gates, 462 U.S. at 233.  However, "a deficiency in one may be compensated for, in determining

the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of

reliability."  Id.

      In the instant case, the affidavit states that a concerned citizen reported that a close

associate had observed scientific glassware at the residence which is commonly used in the

process of manufacturing methamphetamine.  Detective Boelter noted that the concerned citizen

was simply concerned about the welfare of the neighborhood and was not paid for the

information.  (Aff. for Search Warrant at 2.)   Information provided by an unquestionably honest

citizen is subject to less rigorous scrutiny concerning the basis of his knowledge than might

otherwise be required.  See Gates, 462 U.S. at 233-34.  While this information, standing alone, is

insufficient to provide probable cause for a search warrant, it adds to the totality of the

circumstances to be considered in the determination.

Second, a confidential informant told Detective Boelter that occupants of the residence were engaging in a methamphetamine operation.  The confidential informant stated that he had engaged in conversations with the residents regarding the manufacture and distribution of methamphetamine.  Further, Detective Boelter had received information from this informant which had been reliable on prior occasions.  If an informant is known to be unusually reliable, his failure to provide the basis for his knowledge in a particular case should not serve as an absolute bar to a finding of probable cause based on his tip.  Gates, 462 U.S. at 233.  Further, searches of the trash on three separate occasions revealed traces of cocaine and methamphetamine, as well as paraphernalia and packaging materials associated with drug use and distribution.  This evidence served to corroborate the informant's tip.

The information found in the trash concerning telephone numbers and names, standing alone, would not provide probable cause for the warrant.  However, it does contribute to the totality of the circumstances analysis in that it shows the residents of the house were associated with known methamphetamine manufacturers.  Considering the totality of the circumstances, the court concludes that the affidavit provided a substantial basis for a finding of probable cause that

evidence of methamphetamine manufacture would be found at the residence.[3]  See Upton, 466

U.S. at 732-33.

**C. Particularity of the Warrant**

The Fourth Amendment requires that warrants must "particularly describ[e] the place to

be searched, and the persons or things to be seized."  The warrant at issue authorizes the seizure

of items determined to be "fruits or instrumentalities of the crimes of possession or distribution

of a controlled substance."  (Search Warrant, Ex. 1.)  Defendants contend that the warrant is

overbroad and therefore fails to meet the particularity requirement of the Fourth Amendment.

Consequently, all of the fruits of the search should be suppressed.  Defendants argue in the

alternative that items seized pursuant to the "fruits and instrumentalities" clause, but not

specifically enumerated in the warrant should be suppressed.  This includes the firearms and

ammunition seized in the search.[4]

This court has previously rejected this argument.   See United States v. Street, Case no.

2:04-CR-153 DB (D. Utah Feb. 2, 2005)(R&R, Dkt. no. 183, adopted by Order, Dkt. no. 213.)

First, the warrant specifically describes the things to be seized including methamphetamine;

---

[3]Defendants also complain about the information in the affidavit related to individuals coming and going between the house and the motor home.  They state that the existence of the motor home is not indicative of methamphetamine manufacturing.  (Tr. 25-26.)  However, assuming probable cause for the search of the residence, the fact that surveillance revealed individuals coming and going between the house and the motor home supports a reasonable inference that the motor home was involved in the manufacturing operation, and adds to the basis of a finding of probable cause to the search the motor home.

[4]As the government points out, Defendant Decew does not have standing to challenge the seizure of the firearms and ammunition since she was not charged with any firearms violation.  However, Defendant Gordon does have standing to challenge the seizure.

"materials related to the possession or distribution of methamphetamine including plastic bags, scales, measuring devices, and materials used to cut or dilute methamphetamine; and drug paraphernalia described as syringes, pipes or tubes used to inhale or smoke methamphetamine and glassware, chemicals or precursors used to make or use methamphetamine."  (Ex. 1.) Second, the "fruits and instrumentalities" language is specifically linked to "the crimes of possession or distribution of a controlled substance," thus limiting the search to evidence of those particular crimes.  See United States v. Reeves, 210 F.3d 1041, 1043, 1046-47 (9th Cir. 2000)(upholding warrant which authorized search for "other items related to the manufacturing and distribution of controlled substances").

In United States v. Calisto, 838 F.2d 711 (3d Cir. 1988), the defendant argued that police improperly seized firearms because they were not within the scope of the search warrant which authorized seizure of "items used in the manufacture, sale, use, etc. of controlled substances."  Id. at 716.  The court stated, "It is well established that firearms may be considered items used in connection with controlled substances."  Id.  The court held that "the connection between the guns and drugs was close enough to justify seizure of the guns under the warrant."  Id.

Defendant Decew cites United States v. Clark, 31 F.3d 831 (9th Cir. 1994) to support her overbreadth argument.  In Clark, the Ninth Circuit held that a warrant that authorized the seizure of the "fruits and instrumentalities" of a violation of 21 U.S.C. § 841(a)(1) was facially overbroad.  Id. at 836.  The court noted, however, that the defect in the warrant could have been cured had an affidavit been attached to the warrant limiting the general phrase.  Id.  The instant

case is distinguishable because as previously noted, both the warrant and the attached affidavit limit the general "fruits and instrumentalities" language to "crimes of possession or distribution of a controlled substance."

The court concludes that the warrant is not overbroad on its face. However, even if the fruits and instrumentalities clause were impermissibly broad, the firearms still would be subject to seizure under the "plain view doctrine." Officers executing a search warrant may seize items not named in the warrant if in the course of the search they come across an article of "incriminating character," and it is "immediately apparent" to the police that the evidence is incriminating. Coolidge v. New Hampshire, 403 U.S. 443, 465-66 (1971).

In Horton v. California, 496 U.S. 128 (1990), police had a warrant to search for three rings taken in an armed robbery. Although they did not discover the rings during the search, they did find weapons of the type used in the robbery, but not listed in the warrant. Id. at 130-31. In upholding the seizure of the weapons, the Court noted the items "were discovered during a lawful search authorized by a valid warrant." Id. at 142. Further, "it was immediately apparent to the officer that they constituted incriminating evidence." Id. The Court concluded: "The search was authorized by the warrant; the seizure was authorized by the 'plain-view' doctrine." Id.

Of particular relevance to this case, the Tenth Circuit has expressly held that items subject to seizure under "an impermissibly broad portion of a warrant may nevertheless be seized pursuant to the plain view doctrine so long as the government's plain view seizure scrupulously

adheres to the three-prong <u>Horton</u> test."  <u>United States v. Soussi</u>, 29 F.3d 565, 572 (10th Cir.

1994).

As articulated by the Tenth Circuit the government must satisfy the following three

requirements:

> (1) the officer was lawfully in a position from which to view the object seized in
> plain view; (2) the object's incriminating character was immediately apparent–i.e.
> the officer had probable cause to believe the object was contraband or evidence of
> a crime; and (3) the officer had a lawful right of access to the object itself.

<u>United States v. Soussi</u>, 29 F.3d 565, 570 (10th Cir. 1994); <u>United States v. Corral</u>, 970 F.2d 719,

723 (10th Cir.1992); <u>see</u> <u>Horton</u>, 496 U.S. at 136-37.

The three requirements are satisfied in this case.  "A lawful search of fixed premises

generally extends to the entire area in which the object of the search may be found and is not

limited by the possibility that separate acts of entry or opening may be required to complete the

search."  <u>United States v. Naugle</u>, 997 F.2d 819, 822 (10th Cir. 1993)(quoting <u>United States v.</u>

<u>Ross</u>, 456 U.S. 798, 820-21 (1982)).  "Thus, a warrant that authorizes an officer to search a home

for illegal weapons also provides authority to open closets, chests, drawers, and containers in

which the weapon might be found."  <u>Ross</u>, 456 U.S. at 821.  Since the warrant in the instant case

authorized the officers to search for methamphetamine and materials related to possession and

distribution of methamphetamine such as plastic bags, scales, and material used to cut

methamphetamine, as well as drug paraphernalia such as syringes and pipes, the officers were

authorized to look in places where they might also discover weapons.  Second, the officers were

lawfully in the residence and had a right of access to the weapons by virtue of the search warrant. Finally, the incriminating nature of the weapons was immediately apparent because they were found in the same location as precursor chemicals and drug paraphernalia.

The Tenth Circuit has upheld the seizure of weapons during the execution of a search warrant for drugs on numerous occasions.  For example, in United States v. Matthews, 942 F.2d 779 (10th Cir. (1991), the defendant argued that seizure of firearms from his living room exceeded the scope of the warrant which authorized the seizure of "cocaine, fruits, instrumentalities, monies, notations relating to the offense thereof, [and] evidence that establishes occupancy or control of the residence."  Id.  at 782-83.  The Tenth Circuit upheld the seizure under the plain view doctrine.  The court stated:

> Here, the officers came across the weapons during the course of a lawful search for illegal drugs.  Moreover, it has become common knowledge that drug operators frequently acquire weapons for use in connection with drug activities. Hence we think that the weapons' accessibility and proximity to illegal drugs satisfy the condition that their incriminating nature be immediately apparent to the officers.

Id. at 783.

Similarly, in United States v. Janus Indus., 48 F.3d 1548 (10th Cir. 1995), the court applied the plain view doctrine to uphold the seizure of marijuana plants found in a drawer even though the search warrant did not authorize a search for marijuana.  The court noted that the warrant did authorize a search for drug paraphernalia and documents, and documents could have been located in the drawer where the marijuana was found.  Thus, the court concluded that the

marijuana was in a place where the agent was permitted to look, and its incriminating nature was immediately apparent. Id. at 1554-55.

Likewise, in United States v. Le, 173 F.3d 1258 (10th Cir. 1999), the defendant argued that the search warrant failed to meet the particularity requirement because it only authorized a search for methamphetamine and fruits and instrumentalities of methamphetamine transactions, but did not mention explosives, machine guns, or other ordnance. Id. at 1267. While executing the warrant, officers discovered drugs, weapons, and explosives. Id. at 1268. The officers seized the drugs and several types of weapons, but did not seize the heavy weaponry and explosives. Id. at 1268-29. Later the same day, they obtained a second warrant for the other items. The Tenth Circuit stated that while it was lawful and even commendable that the officers waited to seize the explosives until after the issuance of the second warrant, it likely would have been permissible under the plain view doctrine for the officers simply to have seized the explosives without obtaining the second warrant. Id. at 1269.

In the instant case, the officers were lawfully on the premises and had lawful access to the weapons pursuant to the warrant. The incriminating nature of the weapons was immediately apparent due to their accessibility and proximity to chemicals used in the manufacture of methamphetamine. Further, Detective Boelter testified that the officers found a needle and drug paraphernalia near Defendant Decew. (Tr. 41.) Thus, the weapons were also subject to seizure

because they were found in a place where drugs were being used.[5]   Accordingly, the seizure of

the weapons pursuant to the warrant was lawful.

**D. Defendant Decew's Second Motion to Suppress**

Defendant Decew filed a Motion to Suppress Statements of Defendant seeking to

suppress statements she made after she was being held in jail pending trial.  (Dkt. no. 43)

Defendant alleges that sometime following her arrest and after counsel had been appointed to

represent her, she was transported by United States Marshals to the federal courthouse and

interrogated by some law enforcement officer regarding this matter.  She was not given the name

of the officer or his agency.  Defendant asserts that this interrogation violated her Sixth

Amendment right to counsel and her Fifth Amendment right to due process.  (Statement of Def.

Decew in Support of Suppression Mot., Dkt. no. 55, at 2-3.)

The government responds that it has no knowledge of this interrogation, and therefore

does intend to use any such statements against Defendant at trial.  (Government's Resp. to Def.

Decew's Mot. to Suppress at 4-5, & Ex.4 attached thereto, Dkt. no. 76; Tr. 12.)  At the hearing

on the motion to suppress, the court stated, "So far we don't really know if there is anything to

suppress from that other event.  No statements have been provided, the government doesn't

intend to rely on any apparently."  (Tr. 13.)  Under the circumstances, the court should deny

---

[5]The weapons were also subject to seizure because Defendants Allen and Gordon had prior felony
convictions.  However, it is unclear from the evidence if the officers knew of the convictions at the time of the
search.  Detective Boelter did know that Defendant Allen had been arrested for prior drug offenses.  (Aff. for search
warrant at 5.)

Defendant's Decew's second motion to suppress statements.  (Dkt. no. 43.)  However, Defendant

should be allowed to reinstate the motion if the government seeks to introduce at trial any of the

statements obtained in the interrogation at issue.

### III. RECOMMENDATION

The court should deny Defendants' motions to suppress.  (Dkt. nos. 25, 43, 77.)
However, Defendant Decew should be permitted to reinstate her motion to suppress statements
made during an interrogation conducted by unknown law enforcement officers if the government
attempts to introduce any such statements at trial.  (Dkt. no. 43.)

It is further RECOMMENDED that pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J), any
order of the district judge regarding this Report and Recommendation should exclude from the
computation of the Speedy Trial Act, the time from the filing of the Motion to Suppress through
the date of entry of the order of the district judge.

Copies of the foregoing Report and Recommendation are being mailed to the parties, who
are hereby notified that they have the right to object to the Report and Recommendation.  The
parties are further notified that they must file any objections to the Report and Recommendation
with the clerk of the district court, pursuant to 28 U.S.C. § 636(b), within ten (10) days after
receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent
appellate review.

DATED this 23rd day of May, 2005.

David Nuffer
United States Magistrate Judge